# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs June 5, 2018

## ALBERT JACKSON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
No. 12-05328     W. Mark Ward, Judge

_____

## No. W2017-01589-CCA-R3-PC

_____

A Shelby County jury convicted the Petitioner, Albert Jackson, of attempted voluntary manslaughter, employing a firearm during the commission of a felony, reckless endangerment with a deadly weapon, and being a felon in possession of a handgun, and the trial court sentenced the Petitioner to an effective sentence of twenty-four years of incarceration. *State v. Albert Jackson*, No. W2014-00050-CCA-R3-CD, 2014 WL 7432000, at *1 (Tenn. Crim. App., at Jackson, Dec. 30, 2014), *no Tenn. R. App. P. 11 application filed.* This court affirmed the convictions on appeal. *Id.* The Petitioner filed a petition for post-conviction relief challenging the jury instructions and claiming that his trial counsel was ineffective. Appointed counsel added a request for a delayed Rule 11 application. The post-conviction court denied the petition and a delayed appeal. On appeal, the Petitioner contends that the post-conviction court erred when it denied his request for a delayed Rule 11 appeal and when it denied his petition for post-conviction relief. After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

Josie S. Holland, Memphis, Tennessee, for the appellant, Albert Jackson.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Tracye Jones, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts
#### A. Trial

This case arises from the Petitioner and his co-defendant entering a car occupied by two adults and one child, where he brandished and discharged a weapon, causing the driver to crash the vehicle. The Petitioner was indicted for attempted second degree murder, aggravated assault, employing a firearm during the commission of a felony, reckless endangerment with a deadly weapon, and being a felon in possession of a handgun. In our opinion on the Petitioner's direct appeal of his convictions, we summarized the facts presented at trial as follows:

> Marquita Lee testified that, on April 7, 2012, she was at her house with her friends, "Red" and "Amber," as well as her two-year-old son, Marjavius. Red had asked Lashun Peete to drive the women to the nail salon, and Peete arrived to pick them up. When Peete arrived, Keunshay Cooper was with him. Lee had known Peete for approximately ten years and was familiar with Cooper through Peete. Lee, her friends, and son got into the car with Peete and Cooper, and Peete drove Red and Amber to the nail salon. Lee asked Peete to drive her to a bail bondsman because she needed to deposit money for her sister's bond.

> Lee testified that Cooper became angry at Peete because he gave Red $20 to get her nails done, and she hit Peete on the back of the head. Peete and Cooper continued to argue, and Cooper told Peete to drop her off somewhere. Cooper texted with someone who was supposed to meet her at University Cabana, but Peete wanted to meet at a gas station instead. They stopped at a gas station convenience store, but whoever was picking up Cooper did not show up so Peete drove her to the Tillman Cove Apartments.

> Lee testified that, when they pulled into the Tillman Cove Apartments, the [Petitioner] exited a small black car, and Cooper, who exited Peete's vehicle, hugged and kissed the [Petitioner]. The [Petitioner] then got into the backseat of Peete's vehicle and spoke with Peete, while another man, who was with the [Petitioner], asked for a ride to go pick up his child. Lee became suspicious of the other man's need for a ride considering he just got out of a car. However, Cooper told Peete that the man was "okay," and Peete agreed to give him a ride. At that point, the [Petitioner] said that he was not going to join them, but the other man instructed him to come. The [Petitioner] and the other man were in the backseat with Lee's son, and Lee was in the front passenger seat.

> Lee testified that, as they pulled away, she noticed one of the men in the backseat motion "come on" to a burgundy Dodge Charger partially

2

painted with primer that was parked across the street. In order to avoid detection, Lee texted Peete that they were being followed by the Charger. The [Petitioner's] companion gave directions to Peete, and Peete asked the men if they knew they were being followed. The men denied that they were being followed, and Peete pretended to call his cousin who lived in the area. Peete pulled up to a house and acted like he knew the people who lived there, although he did not. He got out of the car and, again, pretended to call his cousin.

Lee testified that the [Petitioner] and the other man also got out of the car when Peete exited the vehicle. The [Petitioner] asked Peete why they had stopped and said, "I don't want to be in no shoot-out." Lee said that Peete did not have a gun, and she had not seen the [Petitioner] or the other man with a gun at that point in time. All three men got back into the car, and Lee brought her son into the front seat with her because she felt uneasy about what was going on. The [Petitioner's] companion instructed Peete to turn right, but Peete said that he would not turn right because it was a dead-end. Peete turned left instead, and the [Petitioner] said, "fuck this shit" and pulled out a gun. As the [Petitioner] tried to insert the clip into the gun, he and Peete started "tussling over the gun" and Peete eventually "pull[ed] the clip out." During the ordeal, the car was still moving at a "normal speed," and the gun was pointed at Lee and her son. Lee, who was nervous and scared, tried to open the car door to jump out, but it was locked. The men were still struggling over the gun when Lee heard two clicking sounds, but the gun was jammed. Lee then jumped from the moving car with her son in her arms, just as the car hit a pole and the door swung back and hit her son on the head.

Lee testified that, after she jumped from the car, she looked back and saw the [Petitioner] holding the gun and walking to the red Charger that had been following them. She also saw Peete fighting with the other man. Lee said that she sustained abrasions all over her leg and hurt her back jumping from the car. Her son sustained a gash to his forehead from the door hitting him, as well as a big knot on the back of his head. After she was transported to the hospital, Lee spoke with Sergeant Perry and provided a written statement. She identified the [Petitioner] from a photographic array as the man who held the gun.

On cross-examination, Lee recalled that the [Petitioner's] gun did not have a clip in it when he pulled it but that he tried to put it in the gun. She also recalled that it was the [Petitioner's] companion who motioned to

3

the Charger and not the [Petitioner].

Lashun Peete testified that he previously dated Keunshay Cooper and that, at the time of the crimes, they had been broken up for approximately one month. On April 7, 2012, he picked up Lee and two of her friends to take them to a nail salon, when Cooper called asking him for a ride. Because he was nearby, he agreed to pick her up as well. He dropped off Lee's two friends at the nail salon, and one of them asked for money to get her nails done. Peete gave her $15, which angered Cooper and she pushed him in the back of his head. They proceeded to argue, and Peete told her that he was going to take her back to where he had picked her up.

Peete testified that he proceeded to drive back to where he had picked up Cooper, but no one was home. Cooper called and texted someone, but no one arrived. Peete told Cooper that he would take her close to her house, but he would not take her all the way there. En route, they stopped at a gas station where they waited for someone to meet Cooper, but no one arrived. Cooper calmed down, and Peete agreed to take her to the Tillman Cove Apartments. When he pulled up to the curb at the apartment complex, the [Petitioner] and another man approached the car while Cooper held the door to the car open as though she was stalling for time. The [Petitioner] asked for a ride, claiming that it was an emergency because he needed to pick up his baby. Peete had met the [Petitioner] on one prior occasion about a month before when Peete showed up at Cooper's house late at night and the [Petitioner] opened the door and told him that she was not at home. Peete also knew the [Petitioner's] brothers.

Peete testified that he agreed to give the [Petitioner] a ride, although he thought it was going to be the [Petitioner] and Cooper, not the [Petitioner] and the other man. Peete told the men that he was familiar with the area and asked where they needed to go, but they refused to tell him and instead gave him step-by-step directions. As they were driving, Peete received a text message from Lee telling him that a red car was following them, which he also noticed. He described the vehicle as a red Charger with black paint as though it had been wrecked. Peete made a left turn and pulled over to see what the red car would do, and it pulled over approximately four car lengths behind him.

Peete testified that the [Petitioner] and his companion "start[ed] acting real paranoid [and] hostile," so he pretended to know the person who

4

lived in the house where he had stopped. He thought that they would not do anything to him if they believed people were around. He got out of the car and pretended to talk on the phone to whoever lived in the house, and he heard the [Petitioner] and his companion say they did not want to be in a "shootout." Peete did not have a gun. When he asked the men if they knew who was following them, they acted "real paranoid" and told him to get back into the car.

Peete testified that he got back into the car, and the [Petitioner] told him to make a right turn. Instead, Peete turned left because there was a dead-end to the right. The [Petitioner] "got real mad and said, 'fuck this.'" Peete saw the [Petitioner] pull "a big automatic weapon with a long extended clip" out of his pants, which he put to the back of Peete's head and told him to "'drive straight, don't turn til I say turn.'" Peete went to pull on his seatbelt and, as he did so, reached around and grabbed the [Petitioner's] gun. Peete and the [Petitioner] began to "tussle," and Peete let go of the steering wheel. As he and the [Petitioner] struggled over the gun, Peete heard the gun click two or three times without firing. The [Petitioner] pointed the gun at Lee and her son, and the [Petitioner], his companion, and Peete all struggled over the weapon. Peete recalled that the [Petitioner] said, "I'm going to shoot, I'm going to shoot" during the struggle. Peete "snatched the clip out" of the gun and, at virtually the same time, Lee and her son jumped out of the car, and the car hit a curb and ran into a pole. The [Petitioner] hit Peete two or three times on the head, then ran to the red Charger. The [Petitioner's] companion fought briefly with Peete, looked for something in Peete's car, and then also ran to the red Charger.

Peete testified that he later gave a statement to the police and identified the [Petitioner] out of a photographic array. Peete said that he suffered injuries to his neck, back, and hand as a result of the incident. He identified the extended clip with extra bullets that he took out of the [Petitioner's] gun. He reiterated that, during his and the [Petitioner's] struggle over the gun, he "heard it click . . . a couple of times like he tried to shoot," and the Petitioner was saying, "I'm going to shoot" as they were fighting over the gun.

Scott Sturgeon was visiting his girlfriend on April 7, 2012. He was mowing the lawn when he heard a big crash, so he left the mower running and went to look around the corner to see what had happened. Upon seeing that a car had struck a telephone pole, he ran back to his lawnmower to shut

5

it off and then returned to the crashed vehicle. Back at the crash site, Sturgeon saw "a guy on top of another guy hitting him on the top of the head." He also saw a woman walking away from the car with a baby. He ran inside to get a piece of paper in order to take down the license plate number and, when he returned, he saw a burgundy Dodge Charger with primer on the fender speeding away. He wrote down the license plate number of the Charger and provided it to the police.

Alan Rogers testified that he was driving on April 7, 2012, when he saw "a small car that's crashed into a telephone pole, and at the back of that car there's a guy getting his head slammed on the trunk." He also saw a red Dodge Charger with the hood and front quarter panels "blacked out." Rogers blew his car horn and started to exit his vehicle, when two men standing near the Charger gestured like they had a gun. The man who was slamming the other man's head on the trunk walked to the Charger, all three men got into the car, and they sped away. Rogers called 911 and followed the Charger. The car eventually stopped in front of a house, the men raised the hood of the vehicle to examine something, and then got into a different vehicle and drove away.

Sergeant Ron Perry with the Memphis Police Department testified concerning his investigation of the case. Gail Rankins, the keeper of records with the Shelby County Criminal Court Clerk's Office, testified concerning the [Petitioner's] history of convictions.

*Jackson*, 2014 WL 7432000, at *1-4. The Petitioner offered proof at the trial that this incident was a drug deal that had gone bad because of counterfeit money and during which he stole $4,800 of marijuana. *Id.* at *4. He further contended that he did not have a gun and that Peete had concocted an untruthful story in retaliation for the events. *Id.* After hearing the evidence, the jury convicted the Petitioner of the lesser included offense of attempted voluntary manslaughter and of the other indicted offenses. The trial court merged the aggravated assault conviction into the attempted voluntary manslaughter conviction and sentenced the Petitioner to an effective sentence of twenty-four years. On appeal, this court affirmed the Petitioner's convictions. *Id.* at *6.

### B. Post-Conviction Petition

The Petitioner filed a timely *pro se* petition for post-conviction relief. In it he alleged that he had received the ineffective assistance of counsel and that the trial court had erred when it instructed the jury. The trial court appointed an attorney for the Petitioner, who filed an amended petition alleging that trial counsel ("Counsel") had been

ineffective for failing to: raise a sentencing issue; adequately prepare or fully investigate the case; subpoena witnesses' criminal history; impeach Ms. Lee, get hospital medical records; have the preliminary hearing transcript prepared; cross-examine a "neutral witness" about hand gestures; exclude Facebook pictures; move to suppress the photographic lineup; object to phone record testimony; and ascertain the owner of the Dodge Charger involved in this case.

At a hearing on this petition, the parties presented the following evidence: Counsel testified that she worked for the Shelby County Public Defender and that she had practiced law for approximately twenty years. Counsel said that the Petitioner was "always adamant about what had happened," and that he maintained that the incident was a drug deal that had gone bad and that he did not have a weapon and that the only weapon belonged to the victim. Counsel said she felt she and Co-counsel provided the Petitioner a good defense, as evidenced by the jury's conviction of a lesser-included offense.

Counsel estimated that she spent between twelve and fifteen hours on this case. She said that there were no personal or professional circumstances that prevented her from preparing for trial. Counsel was assisted by Co-counsel, but Co-counsel had passed away since the trial.

Counsel said that the Petitioner's story about the events was "consistent," so she did not meet with him repeatedly. She did meet with him to discuss his right to testify and to review the facts. She spent the bulk of her time negotiating with the State for a shorter sentence because she was worried about the amount of time the Petitioner faced if he lost at trial. Counsel agreed that she only visited the Petitioner in jail on one occasion for about thirty minutes, but she said she felt that she spent enough time with the Petitioner.

Counsel said that she did not utilize an investigator in this case, relying instead on the Petitioner's version of events. Counsel testified that there were two main witnesses, one of whom said that she did not see a gun. Counsel agreed that she did not conduct any field work in this case. Counsel said she did not hire an expert or present any expert testimony. Counsel said that she did not pursue DNA testing of the gun clip because there was no gun in evidence, which she thought favored the defense, and she did not want to take the risk of DNA testing showing the Petitioner's DNA on the gun clip.

Counsel identified a letter that she had written to the Petitioner. She read a portion of it aloud wherein she told the Petitioner that she had requested a copy of the Petitioner's phone records from the District Attorney and that, as soon as she got the copy, she would forward the phone records to the Petitioner. She also told him about an upcoming evidentiary hearing and then told him that she would visit him about his case toward the

end of July.

Counsel agreed that an issue arose after trial about merger of offenses. She said that this was based on the fact that she had secured a lesser-included offense on one of the charges making the aggravated assault the greater offense. Counsel said that she conducted research about this issue, which she presented to the trial court.

Counsel said she did not recall the cross-examination of Mr. Peete other than that she had cross-examined him. She recalled that at the preliminary hearing Mr. Peete said that he had not been hit with the gun, making his trial testimony inconsistent. Counsel read from the trial transcript, during which the State questioned Mr. Peete about why he had testified that he had not been hit with a gun at the preliminary hearing. The State asked Mr. Peete: "The defense attorney that was cross-examining you [at the preliminary hearing] was confusing you with her question?" Mr. Peete responded, "Yes, sir." Counsel then read from the preliminary hearing transcript during which Mr. Peete testified that the Petitioner never hit him with a gun. Counsel agreed that the preliminary hearing questions did not seem confusing.

During cross-examination, Counsel testified that, while she only visited the Petitioner in jail on one occasion, she and the Petitioner met on a number of occasions when the case was set for hearings or a trial. She estimated that there were seven settings and that each time the Petitioner was brought to the court room, the two would discuss his case.

Counsel said that the Petitioner faced between twenty-two and thirty-eight years in prison if convicted as charged. She got the State to agree to a fourteen-year sentence as part of a plea agreement. Counsel said that she encouraged the Petitioner to think about the fact that if the jury believed the other witnesses and thought he had a gun that he would be sentenced to at least ten years at 100%, even before serving time for any other convictions. The Petitioner maintained that he wanted to take the case to trial, despite the fourteen-year offer, so she prepared for trial.

Counsel said she discussed with the Petitioner the fact that one of the witnesses jumped from the car with a two-year-old child to escape the Petitioner. She told the Petitioner that this case was going to be hard to litigate to a jury. Counsel said that the jury convicted the Petitioner of a lesser-included offense, which took his conviction from a B felony to a D felony. She agreed that, while there was some confusion about the merger of offenses, she lost that argument because there were separate acts supporting aggravated assault: pointing the gun at the victim; and pulling the trigger of the gun. The Petitioner sought six years for his plea and wanted only to be convicted of aggravated assault.

8

Counsel said that she and co-counsel discussed the merger issue, and they presented case law to the trial court. The trial court ultimately decided the issue against them. Counsel said she made all the objections that she thought were necessary and in the Petitioner's best interest. Counsel testified that she cross-examined Mr. Peete about inconsistencies in his testimony.

During redirect examination, Counsel testified that she shared with the Petitioner that it seemed that the only reason that a mother would jump from the vehicle with her two-year-old child would be if there was a weapon drawn. She said, however, that the Petitioner had his own version of events, which was supported by the fact that there was no weapon recovered.

Counsel said that there were multiple facts that were "weird" about this case, including that Mr. Peete was giving the Petitioner and his friend a ride around the corner within walking distance rather than the Petitioner simply walking. Counsel said that she offered the best defense given the Petitioner's version of the facts and the evidence presented.

The Petitioner testified that Counsel visited him only one time, for about fifteen or twenty minutes, before trial. He said that the two did not speak on his court dates and that, when he tried to speak with her, she always said that she would come visit him. He said that he did not get to speak with Counsel enough to prepare for trial.

The Petitioner said that Ms. Cooper was a prostitute by profession and that Mr. Peete was her pimp. The Petitioner said that he began a romantic relationship with Ms. Cooper and took her from Mr. Peete. Two weeks after they began dating, Ms. Cooper got a tattoo of the Petitioner's name across her vagina. Approximately four weeks later, Mr. Peete came to Ms. Cooper's house, and the Petitioner allowed Mr. Peete to get his clothes out of the house. The Petitioner said that there was no animosity at the time between Mr. Peete and him and that, in fact, the Petitioner still purchased marijuana from Mr. Peete. The Petitioner said that he made Counsel aware of the connection between Ms. Cooper, Mr. Peete, and himself, but she never raised it at trial.

The Petitioner said that he conducted drug transactions with Mr. Peete. The Petitioner later learned that Mr. Peete had previously testified against four other people with whom he had engaged in criminal behavior.

The Petitioner said that Counsel should have asked the trial court to instruct the jury on the charge of facilitation. He argued that such an instruction would have been supported by Ms. Lee's testimony that the Petitioner did not want to get into the car with

9

Mr. Peete and Ms. Lee but the man with him, "Albo," said "you going," so the Petitioner got into the car. As further support for a facilitation instruction, Ms. Lee testified that "Albo" flagged the Charger to tell the driver to follow. The Petitioner noted that Ms. Lee also indicated that, after the wreck, "Albo" ran toward the car with the gun and continued to fight with Mr. Peete. He further noted that it was "Albo" who asked for the ride, gave the directions, and continued to fight after the car crashed.

The Petitioner said his only crime was to call Mr. Peete and ask him to come sell them marijuana. When Mr. Peete arrived, he said that he was out of "federal papers" and that, because of the number of cameras in the area, they needed to conduct the drug transaction elsewhere. The Petitioner noted that all the evidence supported that he did not intend to get into the car and go with "Albo," Mr. Peete, and Ms. Lee. He said he did not have a weapon with him that day. He agreed that, after the car accident, he grabbed the marijuana that was in the car before leaving.

The Petitioner maintained that he did not have a gun with him on the day of these events. He said that, because of this, he asked Counsel to have the gun clip that Ms. Lee said that he inserted into the gun forensically tested. He said that he knew that his DNA would not be on the gun clip because he never touched it. He noted that the prosecutor brought out in front of the jury that no forensic testing had been done on the gun clip.

The Petitioner argued that Counsel should have objected during the State's closing arguments when the prosecutor said, "Ladies and gentlemen of the jury, I wouldn't believe nothing that the defendant have to say due to the fact that he have nothing to lose," and then went on to comment on the fact that the Petitioner testified at trial.

The Petitioner contended that Counsel did not adequately cross-examine Mr. Peete. He said that she did not adequately question Mr. Peete about inconsistencies in his testimony. During the preliminary hearing, Mr. Peete said that "Albo got control of the gun" and hit him two or three times.

The Petitioner also asked for a delayed Rule 11 appeal.

During cross-examination, the Petitioner testified that his theory of this case never changed. He said that he had asked Counsel to subpoena Ms. Cooper to confirm his testimony regarding the drug transaction. He said that he wanted to speak with Counsel about Alan Rogers's statement that he saw a man in a red shirt and white jeans motion as if he had a gun. The Petitioner explained that this was significant because the Petitioner had on a black shirt and blue jeans. He said he wanted Counsel to send an investigator to speak with Mr. Rogers, but Counsel refused. The Petitioner agreed that neither Ms. Cooper nor Mr. Rogers were at the post-conviction hearing.

10

Based upon this evidence and the arguments of counsel, the post-conviction court denied the Petitioner's petition for post-conviction relief and denied the Petitioner's request for a delayed Rule 11 appeal. It is from that judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that the post-conviction court erred when it denied his petition for post-conviction relief because Counsel was ineffective and that the post-conviction court erred when it did not grant him a delayed Rule 11 appeal.

### A. Ineffective Assistance of Counsel

The Petitioner contends that Counsel was ineffective for: inadequately preparing for trial; failing to request a jury instruction on facilitation; failing to properly impeach or object to the State's characterization of Mr. Peete's testimony. He asserts that Counsel's performance prejudiced him. The State counters that the Petitioner has failed to prove that Counsel's representation was inadequate or that he was prejudiced by her performance.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2014). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2014). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. *Id*. at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The

following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "'The fact that a particular strategy or tactic failed or hurt the defense, does not, standing

alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S.

The Petitioner contends that Counsel did not spend adequate time preparing for his case and that, while she could have billed the State for 62.5 hours representing him, she only spent fifteen hours on his case. We first note that the Petitioner did not offer any proof that Counsel only spent fifteen hours other than Counsel's own estimation that she spent between fifteen and twenty hours. As the State notes, there is no set number of hours a trial counsel must spend in preparing a case for trial. The Petitioner's case was not complicated. It was the Petitioner's version of events versus Mr. Peete's and Ms. Lee's version of events. There were not many witnesses. Much of the case came down to credibility and whether the jury believed the Petitioner's account that this was a drug deal gone wrong and that he did not have a weapon. By its verdict, the jury accredited some of the Petitioner's version of events. The Petitioner has not proven that Counsel was ineffective or that he was prejudiced by her performance.

The Petitioner next contends that Counsel was ineffective for failing to request a jury instruction on facilitation. About this issue, the post-conviction court found:

> (6) Failure to request a jury instruction on Facilitation.
>
> As to why she did not request a jury instruction on the lesser-included offense of facilitation was because the state's proof was that the [Petitioner] was the one who possessed the gun and her argument was that the [Petitioner] did not have a gun. "Facilitation" is a valid lesser-included offense when a defendant is charged with criminal responsibility of another. *State v. Fowler*, 23 S.W.3d 285 (Tenn. 2000). In this case, the [Petitioner] was not actually charged with criminal responsibility and no jury instruction was given as to criminal responsibility. In addition, an instruction on facilitation is not required when no reasonable jury could have concluded from the evidence presented that the [Petitioner] had the knowledge required for facilitation but lacked the intent required for criminal responsibility. *State v. Robinson*, 146 S.W.3d 469 (Tenn. 2004).

13

No reasonable jury could have found from the evidence presented in this trial that [Petitioner] knew that the other person in the car was going to attempt to kill the victim, but lacked the intent for criminal responsibility. Petitioner has failed to show either "deficient performance" or "prejudice" as to this issue.

We agree with the post-conviction court. Facilitation requires that a person, "knowing that another intends to commit a specific felony," furnishes substantial assistance. The Petitioner asserted at trial and maintained on appeal that this was a drug deal gone wrong. He said that the assault did not occur and that he did not brandish a weapon. The Petitioner was not charged with the drug transaction, the only felony that he admitted any knowledge of, and the State charged him with attempted voluntary manslaughter, employing a firearm during the commission of a felony, reckless endangerment with a deadly weapon, and being a felon in possession of a handgun. The State did not proceed on a theory of him being criminally responsible for the actions of another but proceeded on the theory that the Petitioner was in possession of a handgun, as supported by multiple eyewitnesses, that he used the weapon to commit an assault of the driver, who then wrecked the vehicle.

The Petitioner argued that he never had a weapon and that the driver just happened to wreck the car. As to Ms. Lee, the Petitioner claimed that she jumped out of the car with her child of her own accord and not in response to seeing him with a gun. The Petitioner points to testimony that placed the gun in "Albo's" hands, which could make the Petitioner criminally responsible for "Albo's" actions. His argument fails, however, because, first, the State did not proceed on a theory of criminal responsibility. His argument also fails because there is no evidence that he had knowledge before the offense that "Albo" intended to commit a specific felony. Accordingly, we conclude that the Petitioner has not proven that Counsel's performance was ineffective for failing to request a facilitation instruction or that he was prejudiced by Counsel's performance.

Finally, the Petitioner contends that Counsel was ineffective for failing to properly impeach or object to the State's characterization of Mr. Peete's testimony. About this issue, the post-conviction court found:

(2) Failure to impeach the victim with a prior inconsistent statement.

Contrary to the allegations contained in the Petition, [Counsel] did impeach the witness with the prior inconsistent statement made at the preliminary hearing. When confronted with this fact, Petitioner took the position that she should have cross-examined him "better" about the matter. How to specifically cross-examine a witness is a matter of trial strategy. Further,

14

even if another mode of interrogation had been attempted, it is pure speculation as to what the witness would have said. As such, the Petitioner has failed to demonstrate either "deficient performance" or "prejudice" with regard to this issue.

Our review of the record supports the findings of the post-conviction court. Counsel cross-examined Mr. Peete about his inconsistent testimony. She brought out that he had previously said that the Petitioner did not have a weapon. The State suggested that Mr. Peete was confused by the rapidity at which the questions were asked, explaining the inconsistent testimony. As the post-conviction court found, how Mr. Peete might have responded had Counsel questioned him "more" or "further" on this issue is pure speculation. We cannot conclude that Counsel's performance was deficient or that the Petitioner has proven that he was prejudiced by her performance.

## B. Delayed Appeal

The Petitioner next contends that the post-conviction court erred when it failed to grant him a delayed Rule 11 appeal. At the hearing, the Petitioner contended that he did not file a Rule 11 because his facility was on "lock down." The State counters that the Petitioner waived this issue and further that he has not presented any reason to support the granting of a delayed appeal.

The post-conviction court found:

(8) Failure to file Rule 11 Application

For the record, this Court finds no valid reason to grant a delayed Rule 11 Application in this matter. Petitioner's testimony that he could not file a pro se Application because he was in "lockdown" is not believed by this Court. The proper procedures were followed under Rule 14 of the Rules of the Court of Criminal Appeals. Petitioner had notice of his pro se rights and slept on them and is now attempting to "manufacture" an excuse.

The Petitioner testified that he was prevented from filing a Rule 11 appeal due to his being in "lock down." The post-conviction court found that this testimony was not credible. We conclude that the post-conviction court did not err when it denied the Petitioner a delayed appeal.

## III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the post-

conviction court's judgment.

_____

ROBERT W. WEDEMEYER, JUDGE
